# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 23, 2007         Decided May 11, 2007

No. 04-1234

TRANSCONTINENTAL GAS PIPE LINE CORPORATION,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

SUNOCO, INC. (R&M), ET AL.,
INTERVENORS

Consolidated with
06-1143

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

*Gregory Grady* argued the cause for petitioner. With him on the briefs were *Michael Thompson* and *David A. Glenn*.

*Lona T. Perry*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *John S. Moot*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Richard G. Morgan* was on the brief for intervenor Sunoco, Inc. (R&M).

Before: GRIFFITH and KAVANAUGH, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge*: Transco owns a natural gas pipeline; Sunoco ships gas on Transco's pipeline. In 1992, to settle a lawsuit by Sunoco against Transco, Transco agreed to provide natural gas gathering and transportation services to Sunoco for 20 years. In 2000, Transco decided to sell facilities used to provide the gathering services covered in that agreement to a Transco affiliate, Williams Gas Processing. The Federal Energy Regulatory Commission approved the transfer to Williams, but also ruled that Transco breached its 1992 agreement with Sunoco. As a remedy, FERC ordered Transco to reimburse Sunoco for the extra amount that Sunoco has to pay to obtain gathering services from Williams.

Transco's principal contention is that FERC lacked jurisdiction to impose this remedy because the gathering services become non-jurisdictional once transferred to Williams. We disagree. At the time of the contract, FERC had authority to regulate the gathering services. FERC therefore had authority to order Transco to pay compensation for terminating those services in violation of the contract. Transco's remaining challenges also lack merit, and we therefore deny Transco's petitions for review.

3

I

In 1991, Transco (formally known as Transcontinental Gas Pipe Line Corporation) divided its natural gas transportation services from its natural gas sales services. That "unbundling" enabled customers to purchase either gas or transportation from Transco, rather than requiring customers to buy both the gas and the transportation from Transco. *See Exxon Mobil Corp. v. FERC*, 430 F.3d 1166, 1169 (D.C. Cir. 2005). Transco unbundled its transportation and sales services in preparation for FERC's issuance of Order 636. Issued in 1992, Order 636 promoted competition within the natural gas industry in two ways. It required pipelines to unbundle transportation services from sales services. And it permitted customers to access new sources of gas by abrogating their prior commitments to purchase gas from particular pipeline companies. *See United Distribution Cos. v. FERC*, 88 F.3d 1105, 1126 (D.C. Cir. 1996).

As a consequence of Transco's unbundling, one of its customers, Sunoco, stopped purchasing natural gas from Transco (instead, Sunoco would purchase only the transportation services from Transco). The decision by Sunoco (and other Transco customers) to abrogate their agreements to purchase gas from Transco in turn caused Transco to incur liability to the producers from whom Transco had agreed to purchase natural gas. *See id.* at 1176-77. Under Transco's arrangement with its natural gas producers – a fairly typical arrangement for a natural gas pipeline – Transco had already agreed to "take or pay" for natural gas from those producers to satisfy the demands of Transco's customers. Therefore, after unbundling, Transco owed significant money to its natural gas producers – an amount for which Transco no longer received reimbursement from Sunoco and other customers. *See id.* Like other pipelines, Transco reached settlements with most of its former natural gas customers and divided the "take or pay" liability between

Transco and those customers.

Unlike Transco's other customers, Sunoco objected to Transco's proposed recovery of "take or pay" costs from Sunoco, and five years of litigation ensued. Transco and Sunoco resolved that conflict on February 14, 1992, in a Settlement and Firm Transportation Service Agreement.

In the 1992 settlement, Sunoco agreed to terminate the litigation against Transco. In exchange, Transco agreed to provide Sunoco with 20 years of transportation service from numerous specified points along the Outer Continental Shelf to the Sunoco refinery in Pennsylvania. Transco agreed to provide the entirety of that service (including gathering and transportation) at a single rate – Transco's maximum firm transportation ("FT") rate, which is subject to periodic change by Transco. *See* J.A. 55 (Stipulation: "Appendix A to the Agreement contains the Form of Service Agreement under Rate Schedule FT to be effective between Transco and Sun at such time as the FERC has approved the Agreement . . . ."); *id.* at 98 (Art. V, Service Agreement: "Buyer shall pay Seller for natural gas delivered to Buyer hereunder in accordance with Seller's Rate Schedule FT and the applicable provisions of the General Terms and Conditions of Seller's FERC Gas Tariff . . . .").

On June 4, 1992, FERC approved the agreement. On August 1, 1992, the agreement became effective.

From August 1, 1992, to November 20, 2000, Transco provided Sunoco the transportation services as required by the 1992 agreement. Those transportation services included "gathering" in which Transco took natural gas from wellheads in Texas and transported the gas to a collection point for further movement through Transco's principal transmission system. *See Williams Gas Processing – Gulf Coast Co. v. FERC*, 331

5

F.3d 1011, 1013 (D.C. Cir. 2003) (internal quotation omitted); *see Transcon. Gas Pipe Line Corp.*, 96 FERC ¶ 61,115, at 61,429-30, 61,434-35, *order on reh'g*, 97 FERC ¶ 61,296 (2001), *pets. denied*, *Williams Gas Processing*, 331 F.3d at 1013, *cert. denied*, *sub nom.*, *Producer Coal. v. FERC*, 540 U.S. 1141 (2004) ("*Transco I*").

On November 20, 2000, Transco applied to FERC for permission to sell facilities used to provide those gathering services to an affiliated company, Williams Gas Processing – permission that FERC granted. *See Transco I*, 96 FERC ¶ 61,115, at 61,429. The transfer to Williams has not yet occurred; when it does, Transco will have completed a process known as a "spin down." Transco's spin down of the seven gathering facilities in Texas will remove those facilities from FERC's jurisdiction. Gathering services typically are outside the scope of FERC's jurisdiction unless the services are provided in connection with an interstate pipeline's transmission of gas. *See* 15 U.S.C. § 717(b) ("The provisions of this chapter . . . shall not apply . . . to the production or gathering of natural gas."). At the time of the 1992 settlement between Transco and Sunoco, Transco's gathering services were within FERC's jurisdiction because Transco provided those services in connection with Transco's interstate transmission of gas. *See Williams Gas Processing – Gulf Coast Co. v. FERC*, 373 F.3d 1335, 1337 (D.C. Cir. 2004) (FERC regulates gathering services if gathering services provided by interstate pipelines that resell services in interstate commerce); *Conoco, Inc. v. FERC*, 90 F.3d 536, 540, 545 (D.C. Cir. 1996) (same).

Because the gathering facilities will be non-jurisdictional once sold to Williams, FERC lacked authority to prevent Transco from selling those facilities. And in part for that reason, in 2001, FERC approved Transco's application to transfer the facilities to Williams. *See Transco I*, 96 FERC ¶ 61,115, at

61,435; *see also Williams Gas Processing*, 331 F.3d at 1022.

In 2002, Sunoco filed a complaint with FERC that challenged Transco's spin down, arguing that the costs for the services previously received from Transco would be $15-28 million higher when Sunoco purchased the transportation and gathering services from Transco and Williams. *See Sunoco, Inc. (R&M) v. Transcon. Gas Pipe Line Corp.*, 100 FERC ¶ 61,252, at 61,889-91 (2002). In response to Sunoco's 2002 complaint, FERC required Transco to acquire natural gas capacity from Williams and to assign that capacity to Sunoco at a rate consistent with the 1992 settlement – this would ensure that Sunoco continued to receive the services included in the settlement at the agreed-to price. *Id.* at 61,892, 61,894. As a result of this Court's decisions in cases such as *Williams Gas Processing*, 373 F.3d at 1342-44, which confirmed that FERC lacked jurisdiction to regulate gathering services, FERC vacated the remedy from its 2002 order and imposed a new remedy. FERC decided that Transco must "reimburse Sunoco for any additional costs Sunoco may incur as a result of Transco's violation of the 1992 Settlement rate." *Sunoco, Inc. (R&M) v. Transcon. Gas Pipe Line Corp.*, 111 FERC ¶ 61,400, at 62,675 (2005). Transco now challenges that order in this Court.

II

As the parties agree, all of the natural gas services that Transco committed to provide in the original 1992 settlement were services then within FERC's jurisdiction. Section 16 of the Natural Gas Act authorizes FERC, moreover, "to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of [that Act]." 15 U.S.C. § 717*o*. And the Natural Gas Act gives FERC broad power to remedy violations of the Act. *Columbia Gas*

*Transmission Corp. v. FERC*, 750 F.2d 105, 109 (D.C. Cir. 1984). That authority includes the power to order monetary remedies for violations of contractual obligations.

Transco does not dispute that FERC possesses the authority to remedy breaches of settlement agreements. Instead, Transco suggests that FERC has attempted to indirectly (and impermissibly) regulate Williams's provision of non-jurisdictional gathering services by forcing Transco to reimburse Sunoco for the costs of the gathering services. In Transco's view, such regulation exceeds FERC's authority under Section 1(b) of the Natural Gas Act because FERC cannot regulate gathering services. *See* 15 U.S.C. § 717(b) ("The provisions of this chapter . . . shall not apply to . . . the production or gathering of natural gas.").

We disagree. FERC's reimbursement order does not regulate Williams's provision of gathering services in any way. FERC's order is expressly directed against Transco, not Williams. It requires Transco to reimburse Sunoco for causing Sunoco's costs to increase – in other words, for forcing Sunoco to pay Transco and Williams more than the FT Rate that Sunoco would owe to Transco under the settlement. FERC's order has no effect on Williams's gathering services or the rate that Williams charges Sunoco for gathering. *See Sunoco, Inc. (R&M) v. Transcon. Gas Pipe Line Corp.*, 114 FERC ¶ 61,180, at 61,575-77 (2006) ("*Sunoco VI*").

FERC traditionally has required reimbursement in circumstances such as these. For example, in *Office of the Consumers' Counsel v. FERC*, 808 F.2d 125 (D.C. Cir. 1987), a company abandoned a stretch of pipeline used to provide jurisdictional natural gas service; FERC ordered the company to reimburse customers for the costs of replacing the terminated service with propane service (a non-jurisdictional energy

service).  *See id.* at 127, 129-30.  This Court upheld FERC's order.  *See id.* at 129-30, 133.  Although the order in *Consumers' Counsel* arose in the form of a condition on abandonment, rather than as a remedy for the breach of a contract, the ultimate impact of FERC's order in that case is equivalent to FERC's order here.  Both orders required a FERC-regulated company to reimburse customers when the company increased customers' costs by altering its earlier commitment to provide certain specified services.

The Fifth Circuit approved FERC's imposition of a similar remedy in *Coastal Oil & Gas Corp. v. FERC*, 782 F.2d 1249 (5th Cir. 1986).  Coastal delivered gas to its wholly owned subsidiary, Lo-Vaca Gas Gathering Company, an intrastate pipeline.  Coastal had previously contracted to deliver that gas to a FERC-regulated interstate pipeline belonging to the Florida Gas Transmission Company.  *See id.* at 1250-52.  The Fifth Circuit approved FERC's order requiring Coastal to reimburse Florida Gas for the extra costs that Florida Gas had to pay following Coastal's abandonment of FERC-regulated services. *See id.* at 1253.

In an effort to counter these two decisions, Transco points to other precedents of this Court.  But the cases cited by Transco do not address the issue before us and therefore do not help Transco's cause.

In one of the cases, as a remedy for Columbia Gas's alleged breach of a tariff agreement, FERC required Columbia to provide and pay for services that were outside the scope of FERC's jurisdiction.  *See Columbia Gas Transmission Corp. v. FERC*, 404 F.3d 459, 460, 463 (D.C. Cir. 2005).  FERC lacked jurisdiction to impose the order in that case because Columbia's tariff governed *non-jurisdictional* gathering services *from the time of the tariff's inception*.  *See id.* at 460-61.  Therefore,

regulation of the services in Columbia's tariff was *never* within the scope of FERC's jurisdiction.

Here, by contrast, Transco's settlement agreement with Sunoco covered gathering services that were within FERC's jurisdiction at that time. Because FERC's order in this case (unlike in *Columbia Gas*) remedied the violation of a contract regarding *jurisdictional* services, *Columbia Gas* does not support Transco.

In *Williams Gas Processing – Gulf Coast Co. v. FERC*, 373 F.3d 1335 (D.C. Cir. 2004), Williams Field Services began providing numerous energy companies with gathering services from facilities that Transco previously owned. *See id.* at 1338-40. FERC concluded that Williams Field Services had been charging an unfair rate for those services, so FERC ordered Williams Field Services to change its rate. *See id.* at 1340-41. Although FERC argued that Williams Field Services and Transco were so closely connected that FERC's regulation of Williams's rate was really just a regulation of Transco (a company within FERC's jurisdiction), this Court concluded that Williams acted independently from Transco when it established its rates. Therefore, we found that FERC had no authority to regulate the rate that Williams charged for entirely non-jurisdictional gathering services. *See id.* at 1343.

The difference in the case here, of course, is that FERC's orders have no effect on the rate that Williams Gas Processing will charge Sunoco for the provision of non-jurisdictional gathering services. Rather, FERC's orders simply require Transco to reimburse Sunoco for the extra gathering costs that Sunoco will bear after the spin down. *See Sunoco VI*, 114 FERC ¶ 61,180, at 61,575-77.

The decision in *Conoco Inc. v. FERC*, 90 F.3d 536 (D.C.

Cir. 1996), likewise does not support Transco's argument. In that case, FERC had issued orders related to NorAm Gas's spin down of gathering facilities to NorAm Field. *See id.* at 539, 541, 553. FERC ordered both NorAm Gas and NorAm Field to provide NorAm Gas's former customers with two years of gathering services from NorAm Field following the spin down. *See id.* at 541-42, 550. This Court concluded that FERC lacked jurisdiction to issue the order because it indirectly regulated services provided by NorAm Field, a non-jurisdictional gathering facility. *See id.* at 552-53.

In the orders on appeal in this case, by contrast, FERC has not required Williams to provide Sunoco with gathering services. Therefore, FERC's orders neither directly nor indirectly regulate Williams's provision of non-jurisdictional gathering services. *Cf. Richmond Power & Light v. FERC*, 574 F.2d 610, 620 (D.C. Cir. 1978) ("What the Commission is prohibited from doing directly it may not achieve by indirection.").

In sum, as the case law demonstrates, FERC possesses jurisdiction to order Transco to reimburse Sunoco for the extra costs that Sunoco will bear after Transco transfers facilities used to provide gathering services to Williams.

III

In its petitions, Transco raises eight additional arguments, none of which is persuasive, particularly given the "high degree of deference" we give to "the Commission's interpretation of a settlement agreement." *Transcon. Gas Pipe Line Corp. v. FERC*, 922 F.2d 865, 869 (D.C. Cir. 1991).

*First*, Transco contends that the 1992 agreement governed only jurisdictional services and points out that gathering services

from the seven Texas facilities will cease to fall within that category following the spin down. Because the agreement was intended to apply only to jurisdictional services (so Transco argues), Transco contends that its termination of what are now non-jurisdictional services cannot possibly breach its agreement with Sunoco.

This is incorrect because the agreement included a flat commitment by Transco to provide certain specified services for 20 years. FERC reasonably concluded that Transco's new arrangement breaches that agreement.

*Second*, Transco also argues that its spin-down proposal did not violate the 1992 agreement because Article IV, paragraph 3 of the Settlement and Article V, paragraph 1 of the Service Agreement constitute so-called *Memphis* Clauses. The Clauses provide that nothing in the agreement "is intended, nor shall it be construed, as limiting or affecting in any way Transco's rights under the Natural Gas Act to file and place into effect any changes in rates or modifications, additions, or deletions to its FERC Gas Tariff." J.A. 66 (Settlement); *see also id.* at 98 (Service Agreement). Transco contends that the Clauses permit Transco to unilaterally alter the FT Rate it charges to Sunoco or to abandon gathering services. FERC reasonably found Transco's contention to be both factually and legally flawed.

As a factual matter, the agreement permits Transco to modify only the rate it charges to Sunoco or the general terms and conditions of the service that Transco provides to Sunoco. The *Memphis* Clauses do not purport to provide Transco with any authority to eliminate portions of the services that it provides to Sunoco.

As a legal matter, moreover, the Supreme Court and this Court have confirmed that *Memphis* Clauses ordinarily do not

authorize companies to unilaterally alter the amount of services they have agreed to provide their customers. The *Memphis Light* case from which the Clauses originated involved a contract clause that permitted a change merely in energy rates – not a change in the amount of energy services covered by the relevant contract. *See United Gas Pipe Line Co. v. Memphis Light*, 358 U.S. 103, 105 (1958). This Court has determined that changes in services are not permitted under *Memphis* Clauses. *See Exxon Mobil Corp. v. FERC*, 430 F.3d 1166, 1173 (D.C. Cir. 2005); *id.* at 1168 ("[P]rices may be increased, terms may be altered, but contracts may not be unilaterally amended to effectively add new service."). Transco's *Memphis* Clause argument therefore fails.

*Third*, Transco points to a phrase in Article II(A), paragraph 2, of the settlement that provides: "[A]bandonment of this FT service shall occur only in accordance with the procedures and standards set forth in Section 7(b) of the Natural Gas Act." *See* Petr.'s Br. at 28 (internal quotation omitted). Because the only restriction is the requirement that abandonment comply with the Natural Gas Act, Transco suggests that some abandonment of its services must be permissible.

But the context of the contractual provision in which the "abandonment" phrase appears is as follows: "FERC approval of this Stipulation and Agreement shall provide that pregranted abandonment under Section 284.221(d) of the Regulations will not be applicable to this FT service. As a result, abandonment of this FT service shall occur only in accordance with the procedures and standards set forth in Section 7(b) of the Natural Gas Act." J.A. 61-62 (Art. II(A), ¶ 2, Settlement). This provision does not establish that abandonment of services is permitted if it complies with the Natural Gas Act. The "pregranted abandonment" to which paragraph 2 refers is a specific right to abandon transportation services upon the

expiration of an energy company's contract to provide transportation services. *See* 18 C.F.R. § 284.221(d). Paragraph 2 denies that particular abandonment procedure to Transco; it does not suggest, however, that Transco can abandon energy services before the expiration of Transco's 20-year contract term.

Furthermore, interpreting Article II as permission for Transco to abandon some of the services specified in Exhibit A of the agreement would make no sense. It would contravene the provisions in the agreement that require Transco to provide services for a period of at least 20 years. Why would Transco and Sunoco have agreed to a 20-year contract term if the 1992 agreement really meant that Transco had to provide the services only until Transco unilaterally decided to abandon some of those services? Transco has no answer.

*Fourth*, Transco claims that certain provisions in the 1992 agreement regarding successors show that Transco and Sunoco envisioned Transco's selling facilities used to provide some of its services to other companies, such as Williams. Therefore, according to Transco, FERC should no longer hold Transco responsible for gathering services because Sunoco was aware that Transco might stop providing some of the services. The problem with Transco's argument is that the text of the 1992 agreement explicitly binds Transco's and Sunoco's successors to the agreement. Therefore, either Transco must adhere to the agreement, or Transco's successor must provide the services governed by the 1992 agreement. Because Williams is not such a successor (as Transco has previously argued to FERC), FERC reasonably concluded that Article IV of the Settlement and Article VI of the Service Agreement bind Transco to its 1992 commitment. *See Sunoco, Inc. (R&M) v. Transcon. Gas Pipe Line Corp.*, 114 FERC ¶ 61,180, at 61,575 (2006) ("*Sunoco VI*").

*Fifth*, Transco argues that FERC mischaracterized the FT Rate that Transco must charge Sunoco as a flat rate rather than a cost-based rate. Therefore, according to Transco, Transco could have charged Sunoco an extra fee for gathering services – in addition to the FT Rate – even if Transco continued to provide gathering services to Sunoco rather than abandoning those services. If the 1992 agreement permitted Transco to provide an extra charge for gathering services, Transco contends it certainly cannot be a breach of the agreement for Transco to choose instead to terminate its gathering services while continuing to charge just the FT Rate to Sunoco.

The problem for Transco here is that the terms of the agreement establish that Sunoco would pay a single rate for all of the services that it received from Transco for 20 years – services that initially included Transco's gathering services. Furthermore, Article IV, paragraph 2 of the settlement provides that various portions of the settlement are non-severable – suggesting that Transco could not separate its gathering services and subject them to a distinct charge. As a result, there is no contractual authority for Transco to impose a gathering charge on Sunoco above and beyond the FT Rate that Sunoco pays for the remaining settlement charges. And there is no contractual basis, therefore, for Transco to continue charging Sunoco the full FT Rate without ensuring that Sunoco receives all of the services listed in the agreement at the agreed-upon rate.

*Sixth*, Transco argues that FERC's remedy is inequitable and unreasonable under Section 5 of the Natural Gas Act. *See* 15 U.S.C. § 717d(a) (when FERC finds natural gas rate unjust or unreasonable, "Commission shall determine the just and reasonable rate . . . to be thereafter observed and in force, and shall fix the same by order"). According to Transco, FERC's order is unjust because FERC had already conditioned its approval of Transco's spin down on Transco's decreasing its FT

Rate. *See Transcon. Gas Pipe Line Corp.*, 97 FERC ¶ 61,296, at 62,388-89 (2001). Therefore, as a result of FERC's latest orders, Transco notes that it must both (i) reduce its FT Rate to reflect its lower operating costs without the gathering facilities and (ii) reimburse Sunoco for the extra amount above the FT Rate that Sunoco will have to pay for gathering services after the spin down. According to Transco, that combination of FERC orders causes Transco to face a double burden, which is unjust.

Transco's argument does not account for the fact that Transco never charged Sunoco a rate for services that is broken down to reflect the separate costs of the gathering services. Since 1992, Transco always charged one FT Rate to Sunoco. Therefore, the reduction in Transco's FT Rate to reflect the costs that Transco will save after the spin down is unlikely to equal the extra fees (above the pre-spin down FT Rate) that Sunoco will pay to receive gathering services from Williams. In fact, FERC calculates that Transco's reduction in costs due to abandonment is likely to be de minimis, in contrast to the $15-28 million in extra costs that Sunoco has contended it will bear after the spin down. *See Sunoco VI*, 114 FERC ¶ 61,180, at 61,581-82. Therefore, the mere reduction in Transco's FT Rate that FERC ordered as a condition of Transco's abandonment plainly will not compensate Sunoco for the loss of gathering services that Transco committed to provide in the 1992 agreement. FERC has "broad authority to fashion equitable remedies." *Columbia Gas Transmission Corp. v. FERC*, 750 F.2d 105, 109 (D.C. Cir. 1984). Within that "broad authority," FERC appropriately determined that Sunoco will receive fair treatment under the 1992 agreement only if Transco reimburses Sunoco for the extra gathering costs that Sunoco will pay to Williams after Transco's spin down.

*Seventh*, Transco broadly argues that FERC's order is contrary to FERC's long-standing pro-competitive policies in

favor of unbundling energy services. To be sure, Order 636 encouraged natural gas companies to unbundle their transportation and sales services to promote competition within the natural gas industry. And FERC has concluded that the spin down of gathering facilities furthers FERC's policy in favor of unbundling. *See Transcon. Gas Pipe Line Corp.*, 96 FERC ¶ 61,115, at 61,429-30, 61,434-35, *order on reh'g*, 97 FERC ¶ 61,296 (2001), *pets. denied*, *Williams Gas Processing – Gulf Coast Co. v. FERC*, 331 F.3d 1011, 1013 (D.C. Cir. 2003), *cert. denied*, *sub nom.*, *Producer Coal. v. FERC*, 540 U.S. 1141 (2004).

In addition to its pro-competitive policies, however, FERC also has had a long-term policy in favor of enforcing settlements. *See Brooklyn Union Gas Co. v. FERC*, 409 F.3d 404, 405, 407 (D.C. Cir. 2005); *United Mun. Distribs. Group v. FERC*, 732 F.2d 202, 209 (D.C. Cir. 1984). And FERC's orders in this case simply enforce the 1992 settlement between Transco and Sunoco.

*Eighth*, Transco contends that Sunoco's 2002 challenge to Transco's alleged settlement breach was an improper collateral attack on FERC's 2001 approval of Transco's abandonment of facilities used to provide gathering services. This argument is entirely unpersuasive. In the orders before this Court, FERC did not revisit whether it properly approved Transco's abandonment of gathering facilities. Instead, FERC tried to determine how to fairly remedy Transco's breach of its 1992 agreement in light of Transco's already-approved abandonment. *See Sunoco, Inc. (R&M) v. Transcon. Gas Pipe Line Corp.*, 100 FERC ¶ 61,252, at 61,889 (2002). By contrast, the cases that Transco cites regarding collateral attack involved repeated requests for FERC to consider the same issue. *See, e.g., McCulloch Interstate Gas Corp. v. FPC*, 536 F.2d 910, 912-13 (10th Cir. 1976). Those cases are irrelevant to the issue here.

\* \* \*

We deny Transco's petitions for review.

*So ordered.*