# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 18, 2011       Decided January 17, 2012

No. 08-1349

FREEPORT-MCMORAN CORPORATION, ET AL.
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

EL PASO ELECTRIC COMPANY, ET AL.,
INTERVENORS

Consolidated with 10-1277, 10-1325

On Petitions for Review of Orders of
the Federal Energy Regulatory Commission

*Barbara S. Jost* argued the cause for petitioner Freeport-McMoRan Corporation. With her on the briefs was *Adam S. Caldwell*.

*Kenneth M. Minesinger* argued the cause for petitioner El Paso Natural Gas Company. With him on the briefs were *Howard L. Nelson*, *Richard C. Green*, *Francesca E. Ciliberti*, *Craig V. Richardson*, and *David Cain*.

*Jonathan J. Newlander*, *John R. Ellis*, *Keith T. Sampson*, *Stuart A. Caplan*, *Frank R. Lindh*, *Harvey Y. Morris*, *James H. McGrew*, and *Steven A. Weiler* were on the joint briefs of intervenors in support of petitioner El Paso Natural Gas Company. *Jerry F. Coffey* and *Mary F. McKenzie* entered appearances.

*Lona T. Perry*, Senior Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the briefs were *Michael A. Bardee*, General Counsel, *Robert H. Solomon*, Solicitor, and *Beth G. Pacella*, Senior Attorney.

*John P. Gregg*, *David W. D'Alessandro*, *Douglas M. Canter*, *Lisa S. Novins*, *Keith A. Layton*, *James F. Moriarty*, *Thomas E. Knight*, *Barbara S. Jost*, *Adam S. Caldwell*, *Douglas O. Waikart*, *Wendy B. Warren*, *David S. Shaffer*, *Joel L. Greene*, *and Elizabeth B. Teuwen* were on the joint briefs of intervenors in support of respondent. *Jennifer L. Brough*, *Marie D. Zosa*, and *Kelly A. Daly* entered appearances.

*Kenneth M. Minesinger*, *Howard L. Nelson*, *Richard C. Green*, *Francesca E. Ciliberti*, *Craig V. Richardson*, *David Cain*, *John R. Ellis*, *Jonathan J. Newlander*, and *Steven A. Weiler* were on the briefs for intervenors in support of respondent.

Before: ROGERS, GARLAND, and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*:  El Paso Natural Gas Company ("El Paso") operates an interstate pipeline that transports natural gas to California and other western states, and Freeport-McMoRan Corporation ("Freeport") ships gas on El

3

Paso's pipeline to power its various mining, smelting, and refining facilities. They mount separate challenges to several orders the Federal Energy Regulatory Commission (the "Commission" or "FERC") issued in connection with El Paso's 2005 rate filing and subsequent settlement. We deny the petitions for review.

I

When it converted from bundled sales services to transportation services in 1990, El Paso agreed to sell pipeline capacity through full requirements ("FR") contracts and contract demand ("CD") contracts. In an FR contract, El Paso agreed to provide a shipper with as much capacity as it needed, and in return, the shipper agreed to purchase all of its capacity from El Paso. In a CD contract, El Paso agreed to provide a shipper with a certain amount of capacity, and the shipper was free to purchase additional capacity elsewhere.

The roots of this particular dispute stretch back a decade-and-a-half. In 1996, as a result of California's efforts to deregulate the electricity industry, El Paso's California-based shippers relinquished, or "turned back," their capacity rights, leaving roughly 35% of El Paso's total capacity unsubscribed. The unsubscribed capacity—known as "turnback capacity"—threatened to dramatically increase El Paso's costs and its shippers' rates.

To spread the risk that El Paso would be unable to re-sell, or "remarket," the turnback capacity, the Commission approved a settlement between El Paso and its remaining shippers (the "1996 Settlement"), which established El Paso's terms and conditions of service through December 31, 2005. For the first eight years of the Settlement term, the shippers would bear 35% of the fixed costs relating to the turnback

capacity, while El Paso would credit back to its shippers 35% of the revenue it generated from remarketing that capacity. For the last two years of the Settlement term, El Paso would bear all of the costs relating to turnback capacity, but would keep all of the revenue it generated from remarketing.

In addition to its risk-sharing provisions, the 1996 Settlement limited the rates El Paso could charge its remaining shippers. Article 3 of the Settlement capped the rates El Paso could charge during the ten-year Settlement term. And—critically, for the purposes of this case—Article 11.2 capped the rates El Paso could charge after the Settlement term ended to any shipper "with a [contract] that was in effect on December 31, 1995, and that remain[ed] in effect, in its present form or as amended, on January 1, 2006." *El Paso Natural Gas Co.*, 132 FERC ¶ 61,155, para. 5 n.4 (2010).

Four years after entering into the 1996 Settlement, El Paso's capacity surplus became a shortfall. Energy demand grew rapidly and El Paso had no difficulty remarketing the turnback capacity. Simultaneously, El Paso's FR shippers began demanding much more capacity. Unable to satisfy the demands of all of its shippers with its available capacity, El Paso invoked a provision in its operative tariff that permitted *pro rata* curtailments. The routine use of those curtailments disrupted service and prompted shippers to file complaints against El Paso.

The Commission responded by instituting a Capacity Allocation Proceeding and issuing a series of orders between 2002 and 2004 (the "CAP Orders"). Without faulting El Paso or the FR shippers for the predicament, the Commission determined that El Paso's regular use of *pro rata* curtailments was not just and reasonable, and invoked its authority under

the *Mobile-Sierra* doctrine "to proscribe contractual arrangements that contravene the relevant public interests." *United Distrib. Cos. v. FERC*, 88 F.3d 1105, 1131 (D.C. Cir. 1996). It directed El Paso to reserve the capacity it needed to satisfy its existing CD contracts, and allocate all remaining capacity—including turnback capacity not under CD contract—to the former FR shippers whose contracts were converted to CD contracts with specific contract demand limits. The Commission found that eliminating the unpredictability of the FR contracts would "resolve the current uncertainty on El Paso's system and assure that firm shippers receive[d] the firm service to which they [were] entitled." *El Paso Natural Gas Co.*, 99 FERC ¶ 61,244, 61,997 (2002).

The Commission revised portions of the 1996 Settlement to implement the CAP Orders, rejected calls from some shippers to abrogate the Settlement entirely, and chose to leave the Settlement's rate caps intact. Shippers unhappy with the conversion of their FR contracts filed petitions for review of the CAP Orders, which we denied, finding "substantial evidence of capacity curtailments on El Paso's mainline severe enough to render firm service unreliable and thus justify Commission action." *Arizona Corp. Comm'n v. FERC*, 397 F.3d 952, 954 (D.C. Cir. 2005) ("*ACC v. FERC I*").

In June 2005, El Paso filed a general, system-wide rate case (the "2005 Rate Case"), proposing rates that would go into effect after the 1996 Settlement term ended on December 31, 2005. As part of its filing, El Paso sought to charge rates above the Article 11.2 rate cap to shippers protected by that provision on the ground that the provision had been abrogated by the CAP Orders. The Commission suspended the proposed rate increase and stated Freeport's claim that El

Paso had previously withheld capacity would not be part of its analysis of El Paso's rates. *El Paso Natural Gas Co.*, 112 FERC ¶ 61,150, para. 31 n.26 (2005) (the "2005 Order"). Then, after holding two technical conferences, the Commission issued an order on March 20, 2006, concluding the CAP Orders had not abrogated Article 11.2. *El Paso Natural Gas Co.*, 114 FERC ¶ 61,290 (2006) (the "March 2006 Order"). In addition, the Commission determined Article 11.2 limited the rates El Paso could charge former FR shippers that had converted to CD shippers under the CAP Orders, but did not limit the rates El Paso could charge for capacity it had added to its system after the 1996 Settlement.

With rehearing requests for the March 2006 Order pending, El Paso and its shippers filed a proposed settlement on December 6, 2006 (the "2006 Settlement"). The Settlement proposed "black box" rates—rates not based on El Paso's actual costs—that were lower than the proposed rates in the 2005 Rate Case, and that would remain in effect through December 31, 2008. The Settlement did not resolve the outstanding questions relating to Article 11.2. Instead, it provided that the Commission would rule on those issues in its rehearing of the March 2006 Order, and would implement its rulings after the 2006 Settlement term expired at the end of 2008. The Commission approved the Settlement over Freeport's objections in August 2007. *El Paso Natural Gas Co.*, 120 FERC ¶ 61,208, para. 1 (2007).

In September 2008, the Commission issued its order on rehearing of the March 2006 Order. *El Paso Natural Gas Co.*, 124 FERC ¶ 61,227 (2008) (the "September 2008 Order"). It affirmed that Article 11.2 remained in effect and limited the rates El Paso could charge its former FR shippers. And it clarified that Article 11.2 capped the rates El Paso could charge for turnback capacity it had allocated to its

former FR shippers under the CAP Orders. After the Commission denied requests to rehear the September 2008 Order, *El Paso Natural Gas Co.*, 132 FERC ¶ 61,155 (2010) (the "August 2010 Order"), and denied Freeport's request to rehear the approval of the 2006 Settlement, *El Paso Natural Gas Co.*, 132 FERC ¶ 61,139 (2010), both El Paso and Freeport petitioned for review of the March 2006, September 2008, and August 2010 Orders, and Freeport alone petitioned for review of the 2005 Order and denial of rehearing, *see El Paso Natural Gas Co.*, 116 FERC ¶ 61,016 (2007), as well as the Commission's orders relating to the 2006 Settlement.

II

Predictably, El Paso and Freeport challenge FERC's orders from opposing perspectives. El Paso contends the Commission erred by finding the CAP Orders had not abrogated Article 11.2, and by applying Article 11.2 too broadly. Freeport is one of several intervenors opposing those arguments. Freeport, for its part, claims the Commission erred by applying Article 11.2 too narrowly and by approving the 2006 Settlement. El Paso is one of many intervenors opposing *those* arguments.

We review the challenged orders "under the arbitrary and capricious standard and uphold [the Commission]'s factual findings if supported by substantial evidence." *Sacramento Mun. Util. Dist. v. FERC*, 616 F.3d 520, 528 (D.C. Cir. 2010). We afford a "high degree of deference" to the Commission's interpretation of settlement provisions, *Transcontinental Gas Pipe Line Corp. v. FERC*, 485 F.3d 1172, 1178 (D.C. Cir. 2007), and "substantial deference to the Commission's interpretations of its own regulations," *Bluestone Energy Design, Inc. v. FERC*, 74 F.3d 1288, 1292 (D.C. Cir. 1996).

With those liberal standards in mind, we turn to the petitioners' claims.

A

In the 2005 Rate Case, El Paso argued the CAP Orders abrogated Article 11.2 by fundamentally altering the bargain underlying the 1996 Settlement. The Orders required El Paso to allocate all capacity not under CD contract to its former FR shippers, effectively preventing the remarketing of certain turnback capacity. Because the opportunity to profit from remarketing was the central benefit of the 1996 Settlement, El Paso claimed it should not be constrained by the central burden of the Settlement—the Article 11.2 cap. The Commission's rejection of that argument was reasonable.

Initially, the Commission urges us to find El Paso's argument untimely because El Paso only raised it during the 2005 Rate Case, not during the Capacity Allocation Proceeding. The Commission asserts "'the *entire* 1996 Settlement, including Article 11.2, was under Commission review in the Capacity Allocation Proceeding,'" and El Paso "'should have known or realized the Commission's decision to modify the 1996 Settlement in a limited manner and to keep the remaining provisions, including Article 11.2, would impact El Paso in future rate proceedings.'" FERC Br. 17–18 (quoting August 2010 Order, 132 FERC ¶ 61,155, at paras. 85–86).

But the Commission sang a different tune during the Capacity Allocation Proceeding itself. When certain parties asked it to abrogate the 1996 Settlement because the Settlement terms would produce rates that were not just and reasonable, *El Paso Natural Gas Co.*, 104 FERC ¶ 61,045, paras. 91–92 (2003), it rejected those requests as beyond the

scope of the Proceeding. As it explained in the March 2006 Order, the Proceeding "was narrowly focused on restoring reliability to El Paso's system," so the "continued applicability of Article 11.2 after the expiration of the remaining terms and conditions of the Settlement was not at issue in that case." March 2006 Order, 114 FERC ¶ 61,290, at para. 15. The Commission even assured the parties during the Proceeding that El Paso's next rate filing (*i.e.*, the 2005 Rate Case) would "provide the opportunity to review the justness and reasonableness of the rates and practices on El Paso's system." *El Paso Natural Gas Co.*, 104 FERC ¶ 61,045, at para. 93. Now that El Paso has accepted that invitation to contest the applicability of the Article 11.2 rate cap in the 2005 Rate Case, the Commission can hardly claim the argument is untimely.

On the merits of El Paso's argument, the Commission found the CAP Orders had neither changed the bargain underlying the 1996 Settlement nor abrogated Article 11.2. Although the Orders may have prevented El Paso from generating revenue through remarketing turnback capacity, "El Paso's ability to remarket . . . was always subject to its contractual obligation under the FR customers' [contracts] to use the [turnback] [c]apacity to serve the FR customers." September 2008 Order, 124 FERC ¶ 61,227, at para. 33. In the Commission's telling, by allocating turnback capacity to the FR shippers in the CAP Orders, it merely enforced the obligations El Paso already had when it entered into the 1996 Settlement. *Id.*

That reasoning is sound. As we observed in our earlier review of the CAP Orders, following the 1996 Settlement, "the FR shippers remained free, as the name 'full requirements' suggests, to insist that El Paso meet their full requirements." *ACC v. FERC I*, 397 F.3d at 954. And

nothing in the 1996 Settlement allowed El Paso to prioritize remarketing turnback capacity above using that capacity to satisfy its obligations to the FR shippers. Although El Paso may have entered into the 1996 Settlement with the hopes of profiting from remarketing, the Settlement did not guarantee El Paso that outcome.

El Paso disputes its contractual obligation to allocate turnback capacity to its FR shippers. If such an obligation existed, why didn't the Commission simply enforce it, rather than "chang[ing] the risk sharing provisions and terminat[ing] FR service" in the Capacity Allocation Proceeding? El Paso Br. 17. But the Commission could not have simply ordered El Paso to satisfy its existing obligations—El Paso did not have enough capacity. The very purpose of the Capacity Allocation Proceeding (as its name suggests) was to determine how best to allocate the available capacity on El Paso's system between the competing demands of its shippers, while preserving as much of the 1996 Settlement as possible. *See* September 2008 Order, 124 FERC ¶ 61,227, at para. 35.

A provision in effect during the 1996 Settlement required expansion of the El Paso system only if it was "economically justified." *El Paso Natural Gas Co.*, 104 FERC ¶ 61,045, at para. 100. El Paso contends the Commission negated that provision. In El Paso's view, "[i]f the FR shippers could simply 'grow into' . . . existing capacity for free, the provision effectively requiring them to pay for expansions to serve their growth would have been practically meaningless." El Paso Br. 18. El Paso's argument misconstrues the "economically justified" phrase. That language did not require FR shippers to pay for expansions to serve *any* growth in their demand following the 1996 Settlement; it only prevented the FR shippers from insisting that El Paso engage in economically

infeasible expansions to increase the amount of available capacity. Thus, once the FR shippers had demanded all of the available capacity on El Paso's system, they had a choice between paying to make expansion economically feasible for El Paso, and not paying El Paso and shipping less than their full requirements. They chose the second option, s*ee El Paso Natural Gas Co.*, 104 FERC ¶ 61,045, at para. 103 n.103, but that choice did not compel El Paso to pursue an economically unjustified expansion of its system.

Finally, El Paso maintains the Commission's reasoning contravenes the "central purpose" of the 1996 Settlement, which was to "give [El Paso] the maximum incentive to remarket" turnback capacity, not reserve that capacity for the future use of the FR shippers. El Paso Br. 19. That may well have been the parties' motivation in 1996, when energy demand was relatively low and the FR shippers feared they would be stuck shouldering a large bill for El Paso's unsold turnback capacity. But energy demand grew rapidly in the following years, and while the FR shippers were partially insulated from the costs of unsold turnback capacity, they were fully entitled under their contracts to demand that turnback capacity for themselves. El Paso's quarrel is with the vicissitudes of the energy market and the nature of its FR contracts, not with the Commission's refusal to abrogate Article 11.2.

B

Having upheld the Commission's determination that Article 11.2 remains in effect, we now turn to the petitioners' arguments about the Commission's application of that provision. There are five such arguments: three from El Paso that the Commission applied Article 11.2 too broadly, and two from Freeport that the Commission applied Article 11.2

too narrowly. None of these arguments overcome the "high degree of deference" we afford to the Commission's interpretation of settlement provisions. *Transcontinental Gas*, 485 F.3d at 1178.

1. *The Commission reasonably determined the converted FR contracts were "amended" within the meaning of that term in Article 11.2.* The Article 11.2 rate cap applies "to any firm Shipper with a [contract] that was in effect on December 31, 1995, and that remains in effect, in its present form *or as amended*, on January 1, 2006, but only for the period that such Shipper has not terminated such [contract]." August 2010 Order, 132 FERC ¶ 61,155, at para. 5 n.4 (emphasis added). In the March 2006 Order, the Commission determined the CAP Orders "amended" the FR contracts in effect on December 31, 1995, by converting to them to CD contracts. 114 FERC ¶ 61,290, at para. 39. Accordingly, the Commission found Article 11.2 limited the rates El Paso could charge the former FR shippers. *Id.*

El Paso protests that the Commission's ruling stretches the meaning of "amended" too far. An amendment, El Paso submits, is generally understood to require the consent of both parties to a contract, and it never agreed to convert the FR contracts to CD contracts. But this was not a typical situation. While both parties to an agreement traditionally must agree to amend it, the Commission can unilaterally modify contracts between private parties under the *Mobile-Sierra* public interest doctrine. *See Atlantic City Elec. Co. v. FERC*, 295 F.3d 1, 14 (D.C. Cir. 2002). In this context, the Commission reasonably could interpret "amended" in Article 11.2 to include modifications it imposed without the parties' agreement.

El Paso also contends the CAP Orders could not possibly have "amended" the FR contracts because the Orders dramatically altered the contractual relationship between El Paso and its shippers. El Paso's premise is that an "amendment" can only be a minor revision to a contract, but it cites no authority for that view. Although amendments may often be minor, we perceive no reason they must be. Moreover, "minor" is in the eye of the beholder: the Commission argues the CAP Orders merely effectuated contractual terms El Paso could no longer meet.

El Paso's strongest point is that the Commission itself labeled the converted contracts as "new CD contracts" in the CAP Orders. *See, e.g.*, *El Paso Natural Gas Co.*, 104 FERC ¶ 61,045, paras. 17, 31, 53, 165; *El Paso Natural Gas Co.*, 100 FERC ¶ 61,285, paras. 1–2, 5–6 (2002). That gives us pause. But the Commission also frequently referred to "converting," *El Paso Natural Gas Co.*, 99 FERC ¶ 61,244, at 62,003, 62,007, 62,008–09 (2002), or "modifying," *El Paso Natural Gas Co.*, 104 FERC ¶ 61,045, at paras. 1, 42–43, 98, 105 (2003), the FR contracts in the CAP Orders, so its ruling that the CAP Orders "amended" the FR contracts is consistent with many of its prior characterizations. More importantly, the Commission's ruling is a reasonable interpretation of the Settlement language. That is enough to sustain the ruling given the substantial deference we afford the Commission's "reading of a settlement agreement even where the issue simply involves the proper construction of language." *Transcontinental Gas Pipe Line Corp. v. FERC*, 922 F.2d 865, 869 (D.C. Cir. 1991).

2. *The Commission reasonably determined Article 11.2 applied to turnback capacity.* Article 11.2 "applies to any firm Shipper with a [contract] that was in effect on December 31, 1995 . . .," and prohibits El Paso from "charg[ing] a rate

applicable to service under such [contract]" that exceeds a certain level. August 2010 Order, 132 FERC ¶ 61,155, at para. 5 n.4. The Commission found that "the focus of [Article 11.2] is the *service obligation* under the eligible [contract], not the *capacity* used to meet that obligation." September 2008 Order, 124 FERC ¶ 61,227, at para. 53. As a result, it concluded that the Article 11.2 rate cap applied to any demands for service under contracts that were in effect on December 31, 1995, even if El Paso used turnback capacity to satisfy those demands. *Id.*

El Paso takes issue with that ruling, but we are not persuaded by its concerns. It claims the 1996 Settlement permitted it to "charge rates for the turnback capacity with no restriction on its right to seek FERC approval of rate increases for such capacity after 2005." El Paso Br. 28. But the Settlement did not *guarantee* El Paso the right to charge higher rates for turnback capacity. Instead, the 1996 Settlement allowed El Paso to charge higher rates for turnback capacity *if* it remarketed that capacity. When El Paso had to use turnback capacity to satisfy the demands of its FR shippers under contracts covered by Article 11.2, its right to charge more for that capacity gave way to its contractual obligations.

3. *The Commission reasonably found the applicable rate cap for turnback capacity was determined by the shipper's delivery point.* The 1996 Settlement established different rate caps for different geographic zones. El Paso argued before the Commission that the California rate cap (the highest cap) should apply to the turnback capacity allocated to former FR shippers because that capacity had been turned back by California shippers. The Commission rejected that argument, holding that the delivery point of the shipper now using the

capacity should determine the rate cap. September 2008 Order, 124 FERC ¶ 61,227, at para. 62.

Nothing in the 1996 Settlement labels the turnback capacity as "California capacity" forevermore. Hence, the Commission, in accord with its normal practice, could reasonably base rates on the "rate applicable to the new shipper's receipt points, not the rate that the former shipper paid." *Id.* Although El Paso seizes on the Commission's reference to "rates" instead of rate caps, El Paso fails to explain why that distinction renders the Commission's ruling arbitrary. From the record before us, we see no reason why the Commission's standard approach for determining rates should not apply to determining rate caps.

4. *The Commission reasonably found Article 11.2 did not apply to capacity created by the Line 2000 project.* The Commission found Article 11.2 did not limit the rates El Paso could charge for capacity it had added after the 1996 Settlement through the Line 2000 and Power Up projects. March 2006 Order, 114 FERC ¶ 61,290, at para. 69. The Commission reasoned that because El Paso had no obligation under the 1996 Settlement to expand its system unless it was "economically justifiable," it should be able to recover the full cost of its expansion projects. *Id.* at para. 68.

Freeport concedes Article 11.2 does not apply to expansion capacity, and admits the Power Up project added capacity to the El Paso system. But the company claims the Line 2000 project was a "replacement and reliability project," not an expansion project. Freeport Br. 42. As such, Freeport argues the Commission should have applied the Article 11.2 rate cap to the Line 2000 capacity.

Freeport's characterization of Line 2000 as a "replacement project" relies on two documents: El Paso's Line 2000 project application and the Commission's approval order. Read in their entirety, however, these documents support the Commission's position. In its application, El Paso stated that when it first proposed the project in 2000, it intended to use the new capacity to replace capacity on one of its older pipelines, but after the energy crisis worsened in late 2000, it chose to convert the project from a replacement project to an expansion project. El Paso then explained repeatedly, and in great detail, how the project would add 230 million cubic feet per day (MMcf/d) of capacity to its system. As for the approval order, the Commission's observation that the project was "not intended to serve new market requirements above customers' existing contractual requirements" was consistent with its later ruling that the project expanded capacity. *El Paso Natural Gas Co.*, 95 FERC ¶ 61,176, 61,575 (2001). When the approval order was issued, El Paso lacked sufficient capacity to accommodate the demands of its FR shippers. Thus, the Line 2000 project could expand capacity with the goal of satisfying "existing contractual requirements." *See id.* at 61,574–75 ("[B]y providing more capacity to the system, the project will serve to benefit El Paso's existing customers").

Alternatively, Freeport argues the Line 2000 project only replaced capacity that the Commission permitted El Paso to reserve to manage "transients"—unpredictable increases in pipeline usage. That claim overlooks the Commission's determination in the CAP Orders that "El Paso, like all pipelines, must reserve capacity to manage transients," and the capacity El Paso reserves is not "available system capacity." *El Paso Natural Gas Co.*, 104 FERC ¶ 61,045, at paras. 78, 80. Because the Line 2000 project increased the amount of *available* capacity on El Paso's system, the

Commission reasonably characterized it as providing "expansion capacity" not subject to the Article 11.2 rate cap.

5. *The Commission reasonably adopted the presumption that the capacity of El Paso's system on December 31, 1995 was 4000 MMcf/d.* Apart from the rate cap it imposes, Article 11.2 prohibits El Paso from including in its rates "any cost, charge, surcharge, component, or add-on in any way related to the capacity of its system on December 31, 1995, to deliver gas on a forward haul basis to [eligible] [s]hippers . . . that becomes unsubscribed or is subscribed at less than" the applicable Article 11.2 cap rate. August 2010 Order, 132 FERC ¶ 61,155, at para. 5 n.4. In the March 2006 Order, the Commission adopted the presumption that "the first 4000 MMcf/d of firm subscribed capacity on El Paso's system is 1995 capacity" for the purposes of Article 11.2. 114 FERC ¶ 61,290, at para. 60. That presumption "ensure[d] that El Paso must have [4000 MMcf/d of] subscribed capacity at maximum rates . . . before it can propose to include the cost of unsubscribed or discounted capacity in the rates of eligible shippers." September 2008 Order, 124 FERC ¶ 61,227, at para. 98.

Freeport contends the Commission should have engaged in fact-finding instead of adopting a presumption. In its request for rehearing of the March 2006 Order, Freeport argued the Commission's presumption skewed the intended effect of Article 11.2 by conflating the *amount* of capacity on El Paso's system in 1995 with the *actual* capacity on the system at that time. An example may help illustrate the distinction. Assume that El Paso had 4500 MMcf/d of capacity on its system in 2005, and that all of that capacity was fully subscribed at maximum rates. Then, assume a shipper with a contract in effect in 1995 relinquished 350 MMcf/d of capacity. Applying the Commission's

presumption, El Paso could include the costs of all 350 MMcf/d of that unsubscribed capacity in its rates without running afoul of Article 11.2, because it still had more than 4000 MMcf/d of capacity subscribed at maximum rates. But if Article 11.2 prevented El Paso from charging for unsubscribed capacity that was actually on the system in 1995, then it could not include any of the costs of the 350 MMcf/d in its rates. To address that issue, Freeport requested a hearing in which the Commission would develop a way to differentiate between pre-1995 and post-1995 capacity.

The Commission rejected that request because El Paso "operates its system as an integrated whole," and thus "market[s] undifferentiated capacity which cannot be physically attributed to pre-1995 or post-1995 capacity." September 2008 Order, 124 FERC ¶ 61,227, at para. 98. In light of that limitation, the Commission found it reasonable to adopt the 4000 MMcf/d presumption because El Paso "only had that much capacity on its system" at the time of the 1996 Settlement. *Id.*

Freeport has not challenged the Commission's ruling that it was impossible to distinguish between pre- and post-1995 capacity, and the Commission could reasonably decline to conduct a fact-finding hearing in the absence of a genuine disputed issued. And while Freeport claims the Commission's adoption of a 4000 MMcf/d presumption was arbitrary because it underestimated the amount of capacity on El Paso's system in 1995, the Commission's decision in that regard was reasonable as well. The Commission adopted the 4000 MMcf/d presumption based on the parties' joint representation—in the "Offer of Settlement" for the 1996 Settlement—that the capacity of El Paso's system at that time was "slightly more than 4000 MMcf/d." March 2006 Order, 114 FERC ¶ 61,290, at para. 60. Because the Commission

intended for the presumption to reflect the parties' expectations when they entered into the 1996 Settlement, it reasonably chose to derive the presumption from the parties' joint statement on the Settlement, rather than from El Paso's independent representations in other unrelated filings.

C

We come at last to the 2006 Settlement between El Paso and its shippers. Freeport was the only shipper to contest the Settlement, and it claims the Commission's approval of the Settlement over its objections was procedurally and substantively infirm. We disagree.

As a procedural matter, the Commission may only address the merits of a contested offer of settlement "if the record contains substantial evidence upon which to base a reasoned decision or . . . there is no genuine issue of material fact." 18 C.F.R. § 385.602(h)(1)(i). Freeport submits the Commission did not satisfy this requirement because it improperly excluded evidence relating to a disputed issue—El Paso's culpability for withholding capacity during the energy crisis of 2000 and 2001.

This is the latest round in a long bout over the "capacity withholding evidence." In 2000, the California Public Utilities Commission ("CPUC") filed a complaint with the Commission alleging El Paso had driven up the price of natural gas by withholding available capacity on its pipeline. In 2002, an administrative law judge found in the CPUC's favor. *See Pub. Utils. Comm'n of Cal. v. El Paso Natural Gas Co.*, 100 FERC ¶ 63,041 (2004). But in a subsequent order approving a settlement between El Paso and its shippers on market power issues, the Commission vacated the ALJ's finding because the settlement and the CAP Orders had

absolved El Paso of any capacity withholding liability. *Pub. Utils. Comm'n of Cal. v. El Paso Natural Gas Co.*, 105 FERC ¶ 61,201, at para. 60 (2003). The Commission affirmed that ruling on rehearing, stating it had addressed El Paso's capacity withholding liability "in the Capacity Allocation Proceeding [by] declining to find fault for the capacity problems on El Paso Pipeline's system." *Pub. Utils. Comm'n of Cal. v. El Paso Natural Gas Co.*, 106 FERC ¶ 61,315, at para. 51 (2003).

Various parties petitioned for review. Their "chief concern" was that failing to challenge the Commission's ruling that it had addressed El Paso's capacity withholding liability in the CAP Orders would mean they were "estopped from arguing in the subsequent rate proceeding that El Paso acted to withhold capacity on its pipeline." *Arizona Corp. Comm'n v. FERC*, 168 F. App'x 447, 448 (D.C. Cir. 2005) ("*ACC v. FERC II*"). In a brief judgment, we held petitioners' claim was not ripe unless and until they raised the capacity withholding argument in the 2005 Rate Case. Accordingly, we dismissed the petition "without prejudice to the ability of the petitioners to argue in [the 2005 Rate Case] that neither the Commission's orders in the Capacity Allocation Proceeding, nor the decision of this court in [*ACC v. FERC I*], precludes the argument that El Paso caused the capacity shortfall in 2000–01 by . . . withhold[ing] capacity." *Id.* And we assured the petitioners that if "the Commission later preclude[d] [them] from raising arguments they have raised in the proceeding under review, they may seek redress in this court at that time." *Id.*

Which brings us back to the present case. Freeport sought to introduce evidence relating to the capacity withholding argument during the 2005 Rate Case, and the Commission initially excluded that evidence because it was

"irrelevant" to the rate-setting issues currently before it. *El Paso Natural Gas Co.*, 120 FERC ¶ 61,208, at para. 22. The Commission later clarified that it had excluded the evidence not only because it was irrelevant, but also because Freeport was collaterally estopped from raising El Paso's capacity withholding liability by the CAP Orders. *El Paso Natural Gas Co.*, 132 FERC ¶ 61,139, at paras. 49–61.

Freeport now contends the Commission's collateral estoppel determination violates *ACC v. FERC II*. That is not so. Our limited ruling there was that our dismissal of Freeport's petition could not be used by the Commission in the subsequent rate case as *new* evidence of preclusion. By dismissing the petition "without prejudice," we took no position on whether Freeport should be allowed to make its argument in the next rate case. *ACC v. FERC II*, 168 F. App'x at 448. Indeed, we stated that the question of Freeport's ability to make the capacity withholding argument "should not be resolved" unless it arose in the next rate case, and that if the question did arise, we could then review the Commission's determination. *Id.* That scenario has come to pass, and our review of the Commission's collateral estoppel finding—a finding Freeport does not meaningfully dispute on the merits—reveals no error.

As for Freeport's substantive challenge, we find the Commission's approval of the Settlement appropriate under the so-called second *Trailblazer* approach. That approach permits the Commission to approve a contested settlement if "the contesting party would be in no worse position under the terms of the settlement than if the case were litigated," and "the overall result is just and reasonable, even if some of the aspects of the settlement are problematic and might not warrant approval outside the context of the settlement." *Trailblazer Pipeline Co.*, 87 FERC ¶ 61,110, 61,439 (1999).

Here, the Commission examined the proposed settlement at length and concluded it met both requirements:  it provided Freeport with a host of "real and substantial benefits" that outweighed any potential gains from litigation, particularly because Freeport's litigation strategy relied heavily on the capacity withholding evidence the Commission already had excluded; and it produced an overall result that was just and reasonable for El Paso and all of its shippers.  *El Paso Natural Gas Co.*, 132 FERC ¶ 61,139, at paras. 87–102.  The Commission's approval of the 2006 Settlement thus fell within the substantial "breadth of discretion" it enjoys in this area.  *Arctic Slope Reg'l Corp. v. FERC*, 832 F.2d 158, 164 (D.C. Cir. 1987).

## III

Because the Commission's orders are not arbitrary or capricious, the petitions for review are

*Denied*.